Gaston, Judge.
 

 The plaintiffs, the next of kin of George Hauser, deceased, seek, by this bill, from the defendant, the administrator of the said George, an account of his administration of the estate of his intestate. Their right to an account is not resisted, and a reference to a commissioner for that purpose, follows of course, according to the usages of this Court. But, there is one matter which has been distinctly put in issue by the pleadings, proper to be decided before the account is taken, and upon which the parties have brought the cause to a hearing. (His Honor here stated the allegations of the pleadings as above set forth, and then proceeded as follows:) Upon the proofs, we hold it clear that the transfer of the slaves was not made as an absolute sale to the defendant, but that it was made upon an understanding between him and his intestate, that the same should be a security for the money ad vanced and the liability incurred by him in raising the sum of $818 to pay off the incumbrance of
 
 *215
 
 the execution then levied upon them. All the eircumstan-stances oí the transaction are inconsistent with the idea of an absolute sale. A specific sum was wanted by a needy and hard pressed man for a special emergency, and this precise sum was raised through the agency of his friend and near connection. Now, it is most extraordinary, if the object of the defendant was a purchase, that his
 
 offer
 
 should be regulated, not by any reference to the value of the property to be bought, but exclusively by the amount of the incumbrance from which it was to be relieved. In the next place, the price alleged to have been paid was
 
 ’grossly
 
 inadequate to the value of the slaves. The pretended sale by the defendant, on the 8th of January, 1819, is certainly not a fair criterion of their value; for that was marked by many circumstances clearly intended and well calculated to prevent their bringing a full price. They were set up for sale all in oüe lot, and for cash, without any notice
 
 antecedent
 
 to the day of sale that they would be thus sold — and they were bid off at an unusually early hour of the day, before the arrival of several persons, who went for the express purpose of purchasing some of them. Yet, even at this pretended auction, they were bid off by the defendant’s agent, not, as he loosely alleges in his answer, át á sum between $1,500 and $ 1,700, but for the sum of $1;705 — more than twice the price which he alleges to have paid for them; and not a witness has been examined to shew they were not worth this sum. Now, making every allowance for the alleged solicitude of the intestate to sell the slaves himself, rather than permit them to be sold at execution, where is to be found the motive for selling them to the defendant for less than half the money which might be obtained for them from others? Besides, the transactions at the pretended sale in January, 1819, are utterly inexplicable, upon the supposition that the defendant
 
 alone
 
 was interested therein. We have already seen that it was purposely so managed as to prevent competition. There is no doubt but that the negroes were p'ut up as defendant’s property, and not as the property of his intestate, and for cash; and that these matters were declared in a written notice, affixed to a public place,-
 
 at the day
 
 of said — but if the object had been to eom-
 
 *216
 
 mand the highest price, why were they sold for cash, instead of the usual credit — or, if to be so sold, why was no
 
 previous notice given of the
 
 terms, so that purchasers should come prepared? Several witnesses, who have been examined, de_ dared that they attended with the design of buying — that they attended under the expectation that the property would be sold on the usual credit — and that when they arrived, at an early hour, they were surprised to find that the sale was over, that it had been made for cash, and all the negroes bid in by Conrad. Moreover, the defendant declares that his object in the alleged sale was, to turn this species of property, to the holding of which he has so strong a repugnance, into cash — and yet, we not only find him employing an agent to purchase the property apparently for the agent and in truth for himself, but actually holding the property as his own down to this day. But the case does not rest on these circumstances, strong as they undoubtedly are. There is unquestionable testimony, as we think, furnished by the defendant himself, as to the character of
 
 his
 
 alleged purchase in March, 1818, and the purposes of the pretended sale in January, 1819. On the second of February, 1819, the defendant addresses a letter to Samuel Thomas .Hauser, one of the plaintiffs, in relation to the family and concerns of his late father, in which he says, respecting the latter, “ In my
 
 last
 
 I mentioned to you that I had purchased the plantation at sheriff’s sale for $12,210. I have
 
 taken possession
 
 of Will and his family, and
 
 keep
 
 them on the place for the sum of $51705—
 
 ■this
 
 being the
 
 highest bid,
 
 and
 
 ivas the only way to establish the value of them”
 
 It is manifest, therefore, that he held himself accountable, if he kept the negroes, for their
 
 actual value
 
 — and that the stratagems resorted to in order to prevent competition at the- bidding, were to enable him to claim them at a price short of their actual value.
 

 But this is not all. The defendant avers in his answer that the sum of $>300, part of the price which he actually paid for the purchase of the negroes, was borrowed by him at the time from John Shore. Shore has been examined as a witness, and declares that application was made to him for the loan of this money, first by George Hauser, in person,
 
 *217
 
 and afterwards by John Henry Hauser, in behalf of his father, George; that when this second application was made, Henry produced a letter from the defendant, which the witness exhibits, and which is dated on the 6th of March, 1818, and is in these words:
 

 “ Mr. John Shore: If you can oblige the bearer, J. H. Hau-ser, with 200 or 300 dollars.
 
 I will be his security
 
 for the payment against the time he promises:”
 

 That thereupon the witness lent the money, and took the note of J. H. Hauser and the defendant, the said Hauser signing first. The witness further adds that this note remained unpaid, except the interest thereon, until 1832 or 1833, when the defendant took it up and gave his own bond for the amount. ■ It is not, therefore, true that at the time of the alleged purchase of the negroes, in March, 1818, the defendant had paid the price. Three hundred dollars, part of the sum of $818 wanted to relieve the negroes from the execution, were borrowed by the intestate himself, or by his son on ac-. count of the intestate, and the defendant had only made himself liable therefor as a surety of the borrower.
 

 Upon-the whole view of the allegations and proofs, the Court declares that the slaves in question were conveyed to the defendant only as a security for the moneys by him advanced and the liabilities by him incurred,un removing the incumbrance of the execution then levied upon them — and that the pretended sale of them by the defendant, in January, 1819, has in no manner affected the rights of the next of kin of the intestate, in the equitable interest which the intestate had therein at his death.
 

 Per Curiam. Decree accordingly.